## SOUTHERN ELECTRO–CHEMICAL CO. v. E. I. DU PONT DE NEMOURS & CO.

Circuit Court of Appeals, Third Circuit.
March 1, 1927.

Rehearing Denied May 27, 1927.

No. 3497.

1. Patents ⬡⟞91 (2)—Testimony of practice in foreign countries, not shown to be known by patentee, is incompetent to invalidate patent (Comp. St. § 9469).

Under Rev. St. § 4923 (Comp. St. § 9469), testimony of practice in foreign countries, none of which practice was shown to be known by patentee, was incompetent to invalidate patent.

2. Patents ⬡⟞328—1,031,864, for method of concentrating nitric acid, held valid and infringed.

Pauling patent, No. 1,031,864, claims 1, 3, and 5, relating to methods of concentrating nitric acid, held valid and infringed.

Woolley, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit by the Southern Electro-Chemical Company against E. I. Du Pont de Nemours & Co. for infringement of the Pauling patent, No. 1,031,864, claims 1, 3, and 5. Decree of dismissal (9 F.[2d] 69), and complainant appeals. Reversed, and patent held valid and infringed, and accounting ordered.

Burroughs & Brown, of New York City (Livingston Gifford and H. Lewis Brown, both of New York City, of counsel), for appellant.

Prindle, Wright, Neal & Bean, of New York City (Edwin J. Prindle and Arthur Wright, both of New York City, of counsel), for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and DICKINSON, District Judge.

BUFFINGTON, Circuit Judge. This patent concerns the denitration of sulphuric and the concentration of nitric acid by one of those continuous, straightway, unbroken unitary operations, to the urge for which so many industries have of late years responded. In that respect we note the general practice in the art here in question had separate, individual processes and apparatus for doing the two different things and making the two different products—one a low tower steam plant for denitrating sulphuric acid; and, second, a batch boiling plant for concentrating nitric acid. The patent here involved unified these two operations into one, substituted one apparatus for two, turned two overheads into one, and cut production cost virtually in half. Whether this patent is valid is the decisive question in the case, for, if valid, infringement is clear.

Confining present inquiry to the American art, which was no doubt well known to the patent authorities when called upon to grant the patent involved, we note that the state of the art in the United States, and we might add in Canada and England also, is evidenced by the methods used by the two great, leading companies, the Du Pont Company, the defendant, and the Curtis & Harvey Company, of Canada, which is a branch of the large parent company of that name in England. The practices of both companies in denitrating sulphuric acid and concentrating nitric acid were dual, nonunitary, and in that respect were substantially alike, and continued to be so used by them until they learned from the patentee his method. For denitrating the sulphuric acid in a mixture of nitric and sulphuric acid, Curtis & Harvey in their Canadian works used a countercurrent of steam in a tower of say 8 feet in height. They had seven such low towers, and the strength of the nitric acid produced was 59 to 60 per cent. The Du Pont Company had two denitrating low towers, not over 10 feet high, in which they also used a countercurrent of steam, and from them obtained from 50 to 60 per cent. strength. The concentration of nitric acid was also carried on by both companies in an individual process and by an individual plant. This was known as the batch still method, wherein a batch of the acid mixture was put in a still and the nitric acid evaporated, after which the residuary sulphuric acid was removed, another batch put in and the process repeated. The nitric acid obtained, for example, by the Curtis & Harvey Company was so weak that, in order to highly concentrate it, they had to mix it with a strong sulphuric acid of about 94 per cent. and then subject it to the batch still process, by which it was concentrated to about 87 to 88 strength.

It will thus be seen that, in order to deni-

trate sulphuric acid and to finally obtain highly concentrated nitric acid, these companies had to use two independent operations, two different plants, and provide two different kinds of heat, and neither of these different methods or apparatus had any co-operating relation with the other. The cost of concentration by these successive, independent methods was about $22 to $24 per ton, and the life of the stills very short, due to high temperature. Though the use of these different tower heights, 8 and 10 feet, and of steam as a countercurrent, were factors familiar to these great companies, and equipped as they were also with scientific staffs of advanced thought, and with ample financial resources at their call, no departure from or variation in, or improvement of, these familiar agencies occurred to either of them. Such being the stand-still condition of the art in America, and for that matter everywhere, two men, Dr. Ragnar Sohlman, of Sweden, and Walter Atkinson Wilson, of Great Britain, attempted its improvement. They conceived the idea, and their disclosure was evidenced by patents here and abroad, of integrating the two separate denitrating and concentrating processes into one. This they proposed to do by departing from the old dual art in three particulars: First, for the short tower of the old art they substituted a long one; second, instead of using external heat around a batch still, they used it around their high tower; and, third, they gave up the steam of the old method for a countercurrent, and replaced it by a current of hot air "or any other gas."

That the use of gas, and consequently the nonuse of steam, for their countercurrent, by Sohlman and Wilson, was the essence, or, as they term it, "the main feature," of their proposed improvement is shown both by their specification and claims. Taking their United States patent, No. 1,009,196, applied for April 16, 1909, and granted November 21, 1911, we find their specification stating: "The process consists, chiefly, in having the acid or mixture of acids, or the like, to be treated, flow continuously down through a vertical conduit or column of acid-proof material filled with silica or the like and heated *externally,* and leading a current of hot *air or any other gas* in opposite direction through the said conduit or column. * * * The distillation of the water or the nitric acid is in both cases facilitated by the *hot air,* or the like, supplied from the preheater and flowing upward through the column. This inner current of gas increases in a high degree the efficiency of the apparatus and *forms the main feature* of the present invention."

Upon this specification they received a patent containing two claims, the first of which has an element "supplying at the bottom of the closed chamber a continuous current of a heated vaporizing *gas,* which is cooled during its ascent among the subdivided streams, and *exterially heating* said chamber by a continuous current of hot gases, also decreasing in temperature from the bottom to the top of said chamber, to supply heat to the liquid during its descent," etc.; and the second, "supplying a heated vaporizing *gas* into the bottom of the chamber, and heating the opposed currents of acid mixture and gas by heat conducted thereto from a current of hot gases decreasing in temperature from the bottom to the top of said chamber, the path of flow of the acid mixture being sufficiently long with respect to the temperatures of the gases at the bottom of the chamber to deliver mainly nitric acid vapor from the top of said chamber and dilute sulphuric acid at the bottom of the chamber."

As bearing on the later discussion of the alleged anticipation by Sohlman and Wilson by this patent of the combined use of steam countercurrent and a tall tower, which is the method involved and in issue in this case, we here note that whatever changes or modification of their method might be made, or however seemingly slight those changes might prove to be, in the light of later events, it is certain that the patent neither disclosed or contemplated or claimed the use of steam as a countercurrent agency, and if the art had stopped where Sohlman and Wilson's patent disclosure left it, steam as a countercurrent in a long tower would not have been taught by them, and would not have been known and utilized by the public.

About a year later, Pauling, who had works in Austria and was himself a practical man in the art, undertook to improve the art. Without discussing the laboratory experimental work leading up to it, all of which is proven in the record, we may say that the change Pauling made was so simple, and on the surface seemingly so small, that it is difficult at first sight, in view of the scientific staffs employed by these great companies, to understand why it was not done before, and, indeed, how it involved invention to do it. But when we measure Pauling's work by results, and find that, simple as it is, it enabled this defendant company to virtually cut its production cost in half, the situation is one which stamps the step, surface simple as it is, as one of substance and merit. What he did is stated in a few words. He used a high tower, just as Sohlman and Wilson do; but in using that

high tower he discarded external tower heat, and did not use gas for a countercurrent as they did, and went back to the old short tower practice of using steam as a countercurrent. The gist of Pauling's invention, if invention it was, is the combination of a long tower with a countercurrent of steam; and the practical question here involved is the validity of his patent, for, if valid, infringement is clear. Turning to the question of usefulness: In that regard, we have uncontradicted contrasted costs in the testimony of Hough, technical director of the Curtis & Harvey works, who says: "Our actual cost from our records ran about $23 or $24 a ton. We had considerable upkeep of these stills, and a lot of trouble one way or another with them; fuel was heavy, and we figured from the experiments we made and tests that we could reduce that cost, using a well-regulated Pauling column, to about $10 a ton for the nitric."

Was it novel? In that respect the same witness says that his attention was directed to Pauling's method by a letter he received from the head of the research department of the parent company in England, dated late in 1913 or early in 1914, in which "he drew my attention to an invention—there was no patent included with the letter—to an invention of a Mr. Pauling by means of which in one process highly concentrated nitric acid could be produced from a tower and practically complete denitration of the residual sulphuric acid turning out at the foot of the tower, and he stated that it was obtained by having a very, very long tower." Referring to this information the witness adds: "He certainly put me along a new line of thought, and that was * * * the length of the path the acid—the height of the tower—the length of the path of the acid."

We are therefore of opinion that so far as the working art in the United States is concerned the combination of a high tower with a countercurrent of steam is concerned was novel, and there being nothing to show that Pauling did not believe himself to be the inventor thereof, and having claimed in his application that he was, Revised Statutes, § 4923 (Comp. St. § 9469), provides: "Whenever it appears that a patentee, at the time of making his application for the patent, believed himself to be the original and first inventor or discoverer of the thing patented, the same shall not be held to be void on account of the invention or discovery, or any part thereof, having been known or used in a foreign country, before his invention or discovery thereof, if it had not been patented or described in a printed publication."

[1] Under this statute the testimony as to the practice in foreign countries, none of which practice was shown to be known to Pauling, was incompetent to invalidate his patent. And as we have shown that Sohlman and Wilson's American patent did not anticipate Pauling, it follows that Sohlman's foreign patents, which embodied the same process, had no invalidating effect.

This brings us to the test question in the case: Does Pauling's patent involve invention? As against invention, it is contended the change was slight; that it was merely the substitution in a high tower of a steam countercurrent, instead of an air or gas countercurrent. Physically, that is the fact; but, when the results are looked at which this simple change has brought about in its art, we put behind the word "slight," and find fitting expression in such words as "unlooked for," "revolutionary," and the like.

On the question of invention we have the prima facies of the Patent Office, a prima facies that is strengthened by the fact that the Patent Office, with its knowledge on the subject, found nothing to question the granting of this patent, save two formal references which were brushed aside, and which are not now regarded as anticipatory. And in that connection we note that, while Pauling's application for "a method of concentrating nitric acid" was going through the Office, September 27, 1910, to July 9, 1912, Sohlman and Wilson's patents, one for "a process of concentrating acids" generally, and one for a "process for concentrating nitric acid" specially, April 19, 1909, to November 21, 1911, were both being considered. Presumably, with Sohlman and Wilson in view, the Office neither declared an interference nor cited them, after issue, against Pauling's still pending application. Evidently in the view of the Office they were for different and distinguishable processes. In the nature of things, we cannot define just what makes Pauling's, or any other process, inventive; but when a great art has been for a long time and with blind eyes traveling along a line, and some practical man as here raises his eyes, sees there is a boundary line between prosaic old practice and possible prospective improved practice, and crosses such line by a few short steps, and passes into a new and more productive field, assuredly the shortness and simplicity of his step should not belittle the change it has brought about. The line was always near, but it not only shut off, but closed the sight to the productive field beyond, and when the productiveness of the new fields lead those who still kept working in the old field to fol-

low and now crowd into the new field, we may well contend that the first one to cross the line, the first one to come into—venire, to come, and in, into, and to those two Latin words we go to find the meaning of our English word "invention"—then we are justified in holding that this first comer shall for the time being be the sole holder by government grant in consideration of the novel, useful, and "come into" thing he has done.

As we have said, we regard the combination of a high tower and countercurrent of steam traveling through as the inventive process Pauling disclosed. We may add that, on considering Pauling's process, the German appellate court, using very happily the term "nigh-laying" as showing the slight distance Pauling traveled to secure large and novel results, said: "The invention relates, it is true, only to a slight deviation from the old denitration process; still, it was not so very nigh-laying, not so nigh-laying that an expert intending manufacturing highly concentrated nitric acid could easily think of it. Also a professional man who exactly knew the old process need not arrive at the idea that quite another result could be attained according to the height of the tower. This is revealed by the patent to the defendant, and a new, particular way for obtaining highly concentrated nitric acid has thereby shown the technical domain in question."

It is, however, contended that the Sohlman and Wilson patent, No. 1,009,196, either anticipated Pauling or that it was so near to what Pauling did that no invention was involved in his change therefrom. We state the question in this way, because, in discussing the effect of this prior United States patent, we dispose of Dr. Sohlman's prior foreign patents, which are no closer to Pauling than the foregoing United States one. Now it is said that Pauling did nothing but take the low towers of the defendant and lengthen them, and use the same steam countercurrent as before. Granted; but what did Sohlman and Wilson do? They also took the low tower and lengthened it, and in that respect followed the old practice, but, in addition, they took two steps which were not only wholly different from the old practice, and wholly different from Pauling, and these two departure steps they embodied in their claims. These two steps are the distinctive marks of their process. The first was heat girdling their tower. Thus in describing their invention their specification says their tower is "heated externally." To do this they provide an external furnace and an interior tower, which "consists of a column or tower A composed of pipes of acid-proof material, for instance, pig iron with a high percentage of silicon. The said column is inserted in a furnace shaft B, through which can be led hot gases for heating the column." They describe the function of the furnace as follows: "The acid is supplied from a receptacle E in a uniform current dropping down onto the filling material of the column A, in which it is heated by the hot gases surrounding the column." This furnace, encircling and heat-girdling the tower, embodied as an element in combination in claim 1 as "exteriorly heating said chamber (tower) by a continuous current of hot gases," etc.

It will thus be seen that this furnace, surrounding the tower, was a departure from the old process; that it required additional apparatus; that it was embodied in the generic claim of the patent; and Pauling did not have such a furnace or employ its particular functions. But the departure from the old process and from Pauling, who followed it, does not end with the addition of the furnace. They depart in another way, in that Sohlman and Wilson discard the steam countercurrent and in its place use hot air or gas. This element, they set forth in their specification and carry as an element in their claims. In the specification we find in the description of their process such phrases as "leading a current of *hot air* or any other *gas*;" "a furnace staff B through which can be led *hot gases* for heating the column;" "the column (tower) at its lower end communicates with a preheating apparatus, into which *air* or any other *gas* is sucked or pressed through a pipe D, and from which the said *air* or *gas* is supplied to the column." "The distillation of the water or the nitric acid is in both cases facilitated by the hot *air*, or the like, supplied from the preheater and flowing upward through the column. This inner current of *gas* increases in a high degree the efficiency of the apparatus and *forms the main feature of the present invention.*"

[2] This use of hot air or other gas is specifically carried into the first claim, viz: "Supplying at the bottom of the closed chamber a continuous current of a heated, vaporizing *gas*, which is cooled during its ascent," and into the second, viz., "supplying a heated vaporizing *gas* into the bottom of the chamber." As Pauling uses no heat-girdling encircling furnace outside his tower, and no hot air or other gas within his tower, it is clear he would not infringe the method disclosed by Sohlman and Wilson, nor use their claim-specified elements; and if we are right in saying Pauling did not infringe Sohlman's patent, how can we say that Sohlman and Wilson, with their air or gas countercurrent, anticipated what they

neither disclosed nor claimed, to wit, a steam countercurrent. If they found, as they did, the steam countercurrent in the old art and discarded it, and claimed and got their patent because of their substitution of air or gas as a countercurrent agency, why should not the difference between steam and air or gas which served to get them one patent serve to equally differentiate from their air and gas process another patent which clung to the use of steam?

Evidently the Patent Office, where the two processes were being contemporaneously considered, so regarded the matter. No contention of interference or citation of anticipation is shown. Each application was granted on its respective claims, one embodying an air or gas countercurrent; the other for "a hot gaseous medium composed largely of steam," "a countercurrent of superheated steam," "a countercurrent of steam," and each patentee was entitled to enjoy the field which he fenced off by his claims—Sohlman and Wilson on pre-empting the use of hot air and gas in their high tower, and Pauling the use of steam in his, and if one was entitled to claim invention in his particular field, assuredly the other was equally so. Between the two we draw no line of approval, but the defendant has voiced its approval by adopting the Pauling process, and we can well see that its dispensing with its own two independent processes, the simplicity and consequent cheapness of Pauling's structure, the consequent cutting in half of cost or production, were all elements that led them to do so. They make no pretense that their change from their old system was original on their part, or that they got it from any other source than what they learned when they were freely admitted, under the confidence of supposed future friendly relations, to see the plant Pauling had constructed.

Without further lengthening this extended discussion of the numerous other phases of the case which have had full consideration, we limit ourselves to holding the patent in issue, which we hold has now duly passed to the ownership of the plaintiff, is valid and infringed, and ordering an accounting.

DICKINSON, District Judge, concurs.

WOOLLEY, Circuit Judge (dissenting). I agree that if the patent is valid infringement is certain. My trouble is with the validity of the patent. I have not been able to discover invention in the method disclosed by its claims in view of so much of the prior art as we are permitted to look at and consider. Of course, had Pauling been first to conceive a rectifying column and had he been first to use it as a means to separate an admixture of sulphuric acid and nitric acid and in one operation produce the latter in concentrated form, his would have been a great invention. But Pauling did not do that or anything close to it. What he did was to go to the highly developed art of fractional distillation and select old and well-known means and methods and add one questionably new element. Of these, the main means he appropriated was a rectifying column with its accompanying method, which was described with admirable simplicity by Lord Moulton in British Liquid Air Company, Ltd., v. British Oxygen Company, Ltd., British Court of Appeals, 25 R. P. C. 606, to be "a well-known device in continuous distillation, and consists essentially in a column so filled either with baffle plates or broken stone or small spheres that vapour or liquid passing along it must pursue very devious paths, passing preferably through narrow crevices. If we imagine fluid passing down such a column and vapour passing up it simultaneously, it is evident that they will, in so doing, be brought into the most intimate contact. Suppose now, for example, that the descending stream is a mixture of water and a more volatile liquid, such as alcohol, and the ascending stream is steam, the hotter vapour will be continually parting with its heat to the minute streams of water that it meets and partially evaporating them, itself becoming thereby partially condensed. The alcohol, by reason of its greater volatility, will have the preference in these innumerable partial evaporations, and will pass on with the remaining steam, so that the vapour, as it proceeds upwards, will get richer and richer in alcohol, while the fluid, as it proceeds downwards, will consist more and more completely of water. It gains heat, but loses alcohol. In this way, a continuous process of separation can be carried on, and when it is in regular working the proportion of alcohol at any specific level in the column will be constant, and will gradually increase as you go up the column, from a very low percentage at the bottom to the full strength of the distillate obtainable at the top, while the temperature follows the contrary law and gradually rises as you pass down the column."

As pointed out by Lord Moulton in the cited case, brought to our attention in Air Reduction Co. v. Carbo-Oxygen Co., 17 F.(2d) 138, recently argued in this court, precisely the same thing takes place in Linde's rectifying column where (in another art) relatively warm oxygen vapors ascending the column meet a descending stream of excessively cold

liquid air with its nitrogen and oxygen combined and an infinitude of small partial evaporations takes place, in all of which nitrogen, the more volatile element, has the preference and on being separated from oxygen rises as a gas and is piped off, and oxygen, the less volatile element, separates and condenses and falls as a liquid to the bottom of the column and is there recovered for industrial uses.

Pauling knew or, is charged with knowledge of such practices; the two I have given are but illustrations of many in different though related arts. Nor was Pauling first to treat an admixture of nitric acid and sulphuric acid and separate one, from the other in a rectifying column because the particular art to which he directed his claimed invention contained such a column long known as a denitrating tower, employed to separate these two acids when mixed in a waste product in the manufacture of guncotton and nitroglycerin, to recover them and use them again in the manufacture of explosives. The denitrating tower was the old rectifying column depending for its operation on differences in evaporation and condensation of the elements to be separated from the mixture and had the old countercurrent of vapor in the form of steam passing upwardly through broken stones or spheres or marbles to meet the descending flow of mixed nitric acid and sulphuric acid. The nitric acid, being more volatile, was taken up by the steam and the vapors carried off at the top, while sulphuric acid descended to the bottom and was recovered there. But these denitrating towers with the upward countercurrent of steam were, in America, relatively short, being from 8 to 12 feet in height. Pauling claimed (in his United States patent, applied for 1910 and granted 1912 and in his German patent, applied for 1910 and granted 1913) that by increasing their height, and thereby increasing the length of the countercurrent of the vaporous heating medium, higher concentration of nitric acid can be obtained. He was right in this because Sohlman had done it before him (Norwegian and Swedish patents granted Sohlman and Wilson in 1908; and United States patent applied for 1909 and granted 1911).

Sohlman was first to discover and disclose that high concentration can be effected by a lengthened countercurrent. He raised the denitrating tower from between 8 and 12 feet to more than 16 feet and correspondingly lengthened the countercurrent of vapor. He claimed in his patents and proved in practice that by this greater length of current higher concentration of nitric acid can be obtained—higher, indeed, than Pauling ever obtained. But, being a chemist in the Nobel explosive plants situate in different parts of Europe and being engaged in developing nitrogen fixation from the air as a source of nitrogen and thereby having available highly heated air in quantities so large that air of this character was a by-product of nitrogen fixation plants, he resorted to highly heated air as the vaporous heating medium and employed it in two ways. One, with which we are not presently concerned, was the heating of the denitrating column from the outside. The other, with which we are concerned, was the heating of the denitrating column by a countercurrent of highly heated air on the inside and for the latter he applied for and was granted European and American patents about two years before Pauling. It was after all these long established and highly developed practices in the general fractioning art and in the particular denitrating art that Pauling entered the field. What did he do? He passed from Sohlman's heated air as a vapor or heating medium to an admixture of heated air and steam and to steam alone as heating media, more available in ordinary plants, and employed a lengthened path in a tower higher than the old denitrating tower; yet a tower no higher and with a path no longer than Sohlman had already claimed and disclosed to the world. Therefore it seems to me that, with our eyes closed by the statute (R. S. § 4923 [Comp. St. § 9469]) to prior foreign practices of separating nitric acid from sulphuric acid and, in one operation, concentrating the former in high denitrating towers with long steam countercurrents, the question of the validity of Pauling's patent turns on the answer to one or, perhaps, to all of these questions: Did Pauling make an invention in taking the one-quarter step from Sohlman's long countercurrent of heated air as a vaporous heating medium to an equally long countercurrent of mixed heated air and steam as a vaporous heating medium; or in taking the one-half step from Sohlman's long countercurrent of heated air to an equally long countercurrent of dry steam; or in taking the three-quarter step from Sohlman's long countercurrent of heated air to an equally long countercurrent of steam, preferably superheated? I think he did not.

For this reason I would hold the patent invalid. I am therefore constrained to dissent from the judgment of the court.