## CHAPMAN–STEIN CO. v. RUST ENGINEERING CO.

### No. 4528.

Circuit Court of Appeals, Third Circuit.

March 8, 1932.

Rehearing Denied April 14, 1932.

Clarence P. Byrnes, of Pittsburgh, Pa., Thomas G. Haight, of Jersey City, N. J., and Byrnes, Stebbins, Parmelee & Blenko, of Pittsburgh, Pa., for appellant.

Kenneth S. Neal and Ward, Crosby & Neal, all of New York City, for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

WOOLLEY, Circuit Judge.

Reissue Patent No. 16,826 was granted to Stein in 1927 on an original application filed in 1919 and by mesne assignments was acquired by the plaintiff, in whom, we find on the threshold, rested the title at the time of the alleged infringement and the bringing of this suit. The patent is for a "Recuperative Furnace" and relates to soaking pits, having for its object "a vertical continuously recuperative furnace intended more particularly for the reheating of ingots to the temperature necessary for forging or rolling."

When molten steel is drawn from a furnace it is placed in molds and allowed to solidify in the form of ingots. They are then of uneven temperature, being relatively cold and hard on the surface and molten in the center. In order to be rolled they must be of uniform temperature throughout. To accomplish this, they were, years ago, placed in a pit—positioned underground and located between the furnace and mill—and allowed to attain, by gradual heat absorption, their own uniformity of temperature. This was called "soaking," hence the name "soaking pit." Later, to speed up production and insure a more uniform ingot temperature, the pits were heated.

The fuel used was gas, aided in its combustion by air preheated in a regenerator consisting of at least two chambers of refractory bricks placed in piles and arranged in checker fashion. Over the bricks in one chamber hot burnt gases from the pit furnace passed on their way out and imparted heat to the bricks. The hot exhaust gases were after a few minutes reversed to the other chamber (always with a corresponding reversal of flame in the furnace), and cold air drawn from outside passed over the hot bricks, became heated and then flowed on to meet the fuel gas on entering the furnace, as illustrated in Swindell, No. 327,618 and Talbot, No. 571,250. This alternating process went on until the ingots reached a proper temperature, when they were withdrawn by a crane and sent to the rolls. Other ingots just taken from the molds were put in their place, heated and in turn withdrawn, thus effecting a continuous operation. In this manner waste gases were salvaged, the ingots were heated more uniformly and were capable of being held in the pit at the proper rolling temperature until wanted. Great as was the increase in production and facility of operation effected by this advance in the art, there was, nevertheless, a relatively low ingot capacity measured in respect to available floor space, heating that was not always uniform, poor fuel economy, and excessive slagging and scaling. Thus until 1926 or 1927, with the possible exception of the Schmid and DesGraz patent providing a one-way flame passing in at one side of the pit and out at the opposite side, the standard commercial soaking pit in the United States, operating on the regenerative principle of gas and heated air being alternately projected into the heating chamber from opposite

sides, remained fixed. Except in details of construction, all soaking pits "were in form and principle * · ∴ alike." Indeed for forty or fifty years, this great art remained static until Stein entered it with the new idea of the patent in suit. This had to do not with an aggregation but with a combination of parts, including a recuperator from which to obtain preheated air, an essential element of the operation, coacting with the fuel gas supplied to a furnace of a' particular construction, causing a continuous flame to travel in a peculiar pathway. As indicated repeatedly in the specification and expressly stated in the two claims, 5 and 8, in suit, it is a "vertical" furnace and is thus distinguished from sloping and horizontal furnaces and comprises seven elements:

(1) A hearth or heating chamber vertical in character and arranged to receive and contain ingots standing erect so they may be dropped in for heating and drawn out by a crane preliminarily to rolling or forging; (2) means for admitting and burning in the hearth a combustible mixture of gas and air; (3) means for exhausting the products of combustion; (4) both being located in the same sidewall of the furnace, the admitting means being located above the exhausting means; (5) a recuperator through which the incoming air passes and through which the outgoing products of combustion pass for heating the air; (6) a smoke collector for the final exhaustion of the products of combustion, (7) provided with means (damper) for regulating the exhaust.

The novel conception of this invention, as we see it, is in providing in a soaking pit an all-enveloping flame moving always in one direction down the entire length of the ingot to replace the flame without form, intermittently interrupted and reversed in the prior art. The means to produce such a flame are a heating chamber somewhat in the form of a horseshoe with the live gas inlet and the burnt gas outlet on the same side of the chamber, the latter below the former, and provision for a steady flow of gas and preheated air, without reversal or pulsation, from an instrumentality which will do that thing, such as a recuperator, in which (distinguished from a regenerator) the hot exhaust on its way out is sent through pipes over which cold incoming air passes and picks up the heat. The result in the chamber of this shape with ports so positioned is a continuously descending helical flame, uniform in its intensity and reaching equally every part of the ingots without directly impinging on them.

In 1919 the plaintiff's predecessor, engaged in the manufacture of gas producers, resolved to extend its business to furnaces and accordingly sent an official abroad to look for an improved type. Eventually the Stein patent was bought and exploited. Realizing that in a steel plant the soaking pit operation is "the neck of the bottle," since no more ingots can be cast or rolled than can be passed through the soaking pits, the plaintiff thought that a furnace which would turn out more and better heated ingots and thereby save floor space and operating costs would find a ready market. The art, however, was satisfied with what it had. Being such a radical departure from the practice that had persisted for nearly half a century, the art accorded the Stein furnace a cold reception. Nearly all the large steel companies in the United States were approached, and for a time all turned it down. Eventually, the Donner Steel Company, in 1926, was induced to install a single experimental "hole" of the Stein type and then only on condition that the plaintiff would stand one-half of the expense, the ordinary cost being about $20,000 a hole. From this it is clear the invention, if such it was, did not enter a crowded art. Instead of being crowded, it, in truth, contained a singular dearth of invention. Entering an art which had at least come to a standstill, the Stein furnace had to prove itself. After the Donner hole had been completed and operated, however, the art began to take notice of it. Slowly more installations were made, and finally the art openly accepted it on a showing that the Stein furnace increases ingot capacity from 50% to 100%; effects a fuel saving of from 20% to 25%; insures a more uniform ingot heat; enables better temperature regulation and makes a substantial reduction in maintenance costs. On these demonstrations the plaintiff's business in Stein soaking pit installations jumped from nothing to $600,000 in the two years preceding the trial with about a $1,000,000 of business in prospect.

Thereupon the Rust Engineering Company, a manufacturer since 1917 of standard regenerative soaking pits, entered the plaintiff's field. Realizing, as it must, that the only recuperative soaking pits with a one-way flame installed in this country at that date were those installed by the plaintiff under the Stein patent, it, nevertheless—against timely warnings by the plaintiff—advertised "The

Rust-Amco Recuperative Pit Furnace," "The Rust One-Way Fired Soaking Pit," speaking of "the advantages of the Recuperative Pit Furnace versus the Regenerative Pit Furnace" and by words and diagrams showed substantially the furnace of the Stein patent. It hired six or seven important men who had previously been employed by the plaintiff and who had made the Donner installation and advertised its qualification to make the new installation by saying: "If you will remember that the men of our organization designed and sold all the refractory tile recuperative pits ever built in the United States," naming a price "considerably lower than you can erect * * * the refractory tile recuperative pit"; that we "have presented you a pit using the same principle in firing," etc.

At last the Rust Engineering Company succeeded in obtaining a contract with the Crucible Steel Company for an installation of a pit of the kind it had advertised. That is the infringing act here complained of. Moreover, at the time of trial it had outstanding bids for like furnaces in the sum of $487,-735.

Then the plaintiff brought this action for infringement and had a decree holding the claims in suit valid and infringed. The defendant took this appeal, raising here on review the defenses it had interposed below, of which we shall discuss but two, namely, invalidity because of anticipation, prior publication and, perhaps, for want of invention; and non-infringement.

On the issues of anticipation and prior publication the defendant deals with two patents and one publication, which we shall discuss as follows:

### Chubb, United States Patent No. 90,924 (1869).

We are not clear whether Chubb is cited as an anticipation or only as an illustration of a recuperative furnace. It certainly shows a recuperator. It is equally certain that it is not vertical or intended to take upstanding ingots. It is horizontal. It is not a soaking pit furnace at all, therefore it is in no sense an anticipation. Chubb relates to the general art of furnaces. It may have some importance because the inlet and outlet are on the same side of the heating chamber, the outlet being below the inlet, showing that Stein was not first to think of that arrangement, though first to apply it to soaking pits, and also because of its resemblance to Figure 76 of the Stahl and Eisen Article.

### Chantraine, United States Patent No. 1,402,-568, and French Patent No. 473,999 (1914-1922).

Though entitled "Heating apparatus" the defendant says these companion patents are for the invention of a pit furnace (which it is) and therefore of a soaking pit furnace which anticipates the soaking pit furnace of the patent in suit. It should be noted that every pit furnace is not a soaking pit furnace.

The specifications of the Chantraine patents demonstrate that these furnaces involve essentially the idea of obtaining uniform heating or annealing of a single long object, such as a gun barrel, centrally located within its cylindrical walls and extending through a plurality of successive furnace sections or zones, each one of which, though open to the other, is independently regulated in admitting gas and preheated air from a recuperator. The defendant has taken this furnace apart and picked out one of its zones and thus diagrammatically illustrates the Chantraine invention, pointing to a single zone as an anticipation. This, we think, is an alteration and reorganization which destroys the value of the invention as an anticipation. Clearly, no one looking at Chantraine would think of Stein. Even when thus cut into parts and reorganized, it is clear that the chamber is vertical as before, and is intended as before to receive from the top and hold a single upstanding gun barrel or other thing to be heated or annealed, instead, as in the Stein furnace, of a plurality of objects to be heated for forging or rolling, and that the gas comes in through an inlet in one side or at one point in the arc of the cylinder and meets preheated air coming in at an angle of about forty-five degrees through a port at another point in the arc and, because of the cylindrical walls of the furnace, the combined gas and air descend in flame down and around the article to be treated and the burned gases pass out below to the recuperator, not "in the same sidewall" in which the gas comes in, as prescribed by Stein, but at a point in the arc of the wall nearly opposed to the point at which the gas enters.

We agree with the learned trial judge that the Chantraine patents do not show the same relative position of inlet and exhaust ports as the patent in suit, an essential part of the invention; that, not being for a soaking pit furnace, they do not suggest the solution of American soaking pit problems; and that they do not constitute anticipations of the in-

vention of the patent with which we are concerned.

## Stahl and Eisen Article (1914).

Stahl and Eisen wrote articles on the subject of furnaces which were published serially in Germany over a period of two years. One section is devoted to soaking pits (Exhibit 29). Though pits of this character are the subject of the present controversy, little, if any, allusion is made to this Stahl and Eisen article. On its defense of prior publication the defendant depends on a Stahl and Eisen article published in 1914 and entitled "Ueber den Heutigen Stand der Wärm und Glühöfen," or, when translated, "Concerning the Present Status of Heating and Annealing Furnaces," and particularly on its descriptions of two furnaces, Figures 75 and 76, which it says disclose the Stein invention. In order to bring this publication within the range of the soaking pit invention of the patent and use it as a prior publication, the defendant has raised an issue as to its translation. Taking the furnaces from under the general title of the German article as annealing furnaces, it maintains that the German word "tiefofen" means in English "soaking pit furnace," while the plaintiff maintains it simply means "pit furnace"—a low-lying furnace depressed below the floor of the plant for annealing or other heating purpose. And again, the plaintiff translates the German word "glühofen" as an "annealing" or "heat treating furnace"; the defendant as "annealing or heating furnace," and maintains that the furnaces of the article are pit heating furnaces, then taking another step, soaking pit furnaces, and therefore within the art of the patent. Or, if they are not, it finally maintains that even if the furnaces of the German article are annealing furnaces, they can be used as soaking pits too, and that, anyhow, they are in an analogous art and therefore the prior publication voids the patent.

We are not disposed to decide the question of prior publication on this issue of translation where we should have to accept the translation of one witness and reject that of the other on a showing of equal qualification and veracity. Rather, we are moved to decide the question on what the furnaces themselves disclose, adhering, of course, to the publication and its diagrams.

Figure 75 shows a furnace with a one-way flame from gas, and from air preheated in a recuperator. So far, this is like Stein. The heating chamber, however, is not "vertical" but, except for a slight incline, is horizontal. It not being possible to heat the objects standing up, they are laid down on the inclined floor of the furnace and rolled gradually toward the firing end and when heated are withdrawn from the side of the furnace. From its structure and mode of operation we are of opinion this is an annealing furnace in which material is treated by gradual heating and cooling to remove internal strains. If we are wrong and it can conceivably be operated as a soaking pit furnace in which material is heated to a higher temperature for subsequent rolling or forging, then we hold that it could not, as in fact it did not, suggest the soaking pit furnace of the patent to any one skilled in the art, Skelly Oil Co. v. Universal Oil Products Co. (C. C. A.) 31 F. (2d) 427, 431, and could not be used for that purpose except by a radical and complete reorganization.

Figure 76 is more in point. It shows a furnace not with a horseshoe heating chamber by which to give a helical turn to the flame but a rectangular heating chamber supplied on one side with an inlet for gas and air, the latter preheated in a recuperator, and an outlet below and on the same side for the exit of burnt gases, and suggesting a one-way flame, not helical as in the patent but moving from the top broadly downward. It may be, in underground position, a pit furnace, but that does not mean a soaking pit furnace. In harmony with the court below we think it is an annealing furnace. In an annealing furnace the material being heated usually lies down so that the heating gases may pass under it and envelop it from top to bottom. The heating chamber of this furnace suggests no intention that the article should stand up but provision is expressly made by rails or ledges for it to lie down. A vertically descending helical flame in such a chamber would be purposeless. The heating chamber is horizontal, not vertical as in that of the patent. Neither in dimensions nor in function is it similar to the "hole" or battery of "holes" of the patented soaking pit, individually controlled and in which ingots at all times—four or more in number—are successively placed and withdrawn. It is a chamber—one disclosure twenty-two feet and the other thirty-four feet long—manifestly intended for one operation such as annealing and not for constant additions and withdrawals of ingots throughout a continuous run of many days. The fact that by slides or partitions this long chamber may be shortened does not alter its function or purpose. Again,

we find ourselves in accord with the learned trial judge in finding that Figure 76 shows an annealing furnace. But if we are wrong in this, the disclosure, we think, would not, as on the evidence it did not, suggest to any one the invention of the patent, Skelly Oil Co. v. Universal Oil Products Co., supra, and could not be made to do its work without substantial reorganization. It is structurally and functionally an enlargement of the Chubb furnace of 1869 with recuperator pipes differently arranged. Neither made any impress upon the soaking pit art. Nor do we think that because Figure 76 discloses a furnace and because the function of a furnace is to heat something, it is therefore in an art analogous to that of the invention of the patent. In the great steel art there have been and still are furnaces of many kinds, used on different materials to obtain different results, which involve separate and distinct inventions.

We are of opinion that the Stahl and Eisen publication does not invalidate the claims of the patent in suit.

Being new, and, on the defendant's own showing, being useful, and patentably so, we affirm that part of the decree of the trial court which held the claims of the patent in suit valid.

On the issue of infringement, the essentials of the furnace of the patent are easily discernible in the alleged infringing soaking pit furnace-heating chamber, ports positioned one below the other on one side, means for supplying gas and a steady stream of preheated air. The defense is based on a variety of inconsequential differences, such as the position of the gas inlet in respect to the top of the ingots, a matter not limited by the claims, but particularly on the fact that the defendant to obtain preheated air uses a "regenerator" instead of a "recuperator" as mentioned in the patent.

The purpose of these two instrumentalities is the same. It is to preheat air for use in conjunction with gas in a furnace, not in a soaking pit furnace alone but in any furnace where gas is the fuel. There are many such furnaces used for different purposes in the steel industry and other industries. For a long time, and even as late as this alleged infringement, the words "regenerator" and "recuperator" were used interchangeably in the steel industry to denote simply a means for preheating air. (The word "regenerator" is used in the original patent; "recuperator" in the reissue). The defendant itself in advertising soaking pits of the Stein type,

though using regenerators, spoke of them to the trade as recuperators. Recently, however, we may assume that when the word "regenerator" is used it is intended to mean an air preheater of the type already described, which has two or more checker brick chambers through which hot exhaust gases flow on their way out from the furnace and heat the bricks, and, on reversal, cold air is heated by the bricks on its way in, carrying a corresponding reversal or pulsation of air and gas in the heating chamber, and that the word "recuperator" applies to a preheater where burnt gases pass out continuously through pipes and the cold air, coming in, continuously passes over the hot pipes and then moves on to the heating chamber without interruption or pulsation, or to a preheater where the cold air and exhaust gas movements are the opposite. Regenerators, however, have been so improved by increasing the number of checker chambers and enlarging the connecting pipes that the preheated air reaches and passes into the heating chamber without functionally perceptible interruption or pulsation on reversal. Of these the Blaw-Knox three-chamber preheater or regenerator is an example. The defendant uses the Blaw-Knox regenerator and through it gets the continuous air flow of a recuperator, and, with the aid of aligned ports, a continuous one-way flame in its heating chamber exactly as in the furnace of the patent. The defendant obtains this one-way continuous preheated air flow, an essential in the operation of the furnace of the patent, in substantially the same way as from a recuperator. Its regenerator performs precisely the same function, as the defendant itself told the industry when advertising a recuperator yet actually using a regenerator, and produces the same results.

Therefore we concur with the learned trial judge that they are equivalents "even though they differ in name, form and shape," Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 125, 24 L. Ed. 935; Curtis, Patents (4th Ed.) § 310, and that the patent is infringed unless a recuperator per se is an element of the claims limiting their terms. But, as in Otto Coking Co. v. Koppers Co. (C. C. A.) 258 F. 122, 139, a recuperator or regenerator is not Stein's invention. His invention is a soaking pit furnace consisting of an organization of which a preheater is a part. Stein did not make or patent a new kind of preheater, or, calling his preheater a recuperator, he did not make or patent a new kind of recuperator. Wanting a steady hot air flow, he simply went to the art and picked

out a preheater, an essential in his organization. He happened to select a recuperator. The Blaw-Knox regenerator would have done the same thing and would have done it just as well. He then used the product of the preheater—preheated air—common to both recuperator and regenerator—in connection with his heating chamber of peculiar shape, having a particular arrangement of inlet and outlet and producing a flame flow of a peculiar character and in a particular direction. Stein's true invention is in the heating chamber, not in the character of the instrumentality which supplies the chamber with heated air. We are constrained to find infringement.

The decree below is affirmed.