## SINCLAIR REFINING CO. v. GLOBE OIL & REFINING CO.
### No. 969.

District Court, D. Delaware.

July 22, 1937.

Dean S. Edmonds, Raymond F. Adams, and S. Howell Brown, Jr. (of Pennie, Davis, Marvin and Edmonds), all of New York City, and E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., for plaintiff.

Louis Quarles, Howard A. Hartman, and David A. Fox (of Lines, Spooner & Quarles), all of Milwaukee, Wis., C. Stanley Thompson and Frederick Schafer, both of Washington, D. C., and Arthur G. Logan (of Marvel, Morford, Ward & Logan), of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a patent infringement suit of Sinclair Refining Company, plaintiff, against Globe Oil & Refining Company, defendant. The bill of complaint charges defendant with infringement of three letters patent:

(1) Patent No. 1,574,546, for an "Oil Heating Furnace," applied for January 28, 1922, and issued February 23, 1926, to John E. Bell, assignor to plaintiff, with claims Nos. 1, 2, 3, 9, and 13 in suit.

(2) Patent No. 1,574,547, for the "Operation of Oil Stills," applied for as a continuation of the first application on August 10, 1923, and issued like the first patent, with claims Nos. 1, 2, 5, 7, and 8 in suit.

(3) Patent No. 1,623,773, for an "Oil Still," applied for August 10, 1923, and issued like the first and second patents, with claims Nos. 1, 2, 3, 4, 7, 12, 13, 14, 15, and 16 in suit. The infringement charged in the bill of complaint is the operation of Jenkins' stills for cracking oil in defendant's refinery at Cushing, Okl.

The defenses are invalidity and noninfringement. Defendant alleges that the inventions of all three patents were anticipated and lack invention, and that the inventions of the first and second patents were in public use by plaintiff more than two years before January 22, 1922, the date of application for the first patent.

In brief, these three patents relate to improvements in cracking operations carried out in pressure stills in which high boiling petroleum oil is heated to a high temperature under high pressure by heat transferred from furnace gases to the oil in heating tubes. The first two patents describe and claim, respectively, an apparatus and process for recirculating flue gases as a diluent for tempering the hot products of combustion from the firebox in which the fuel is burned before the resulting mixture passes over the heating tubes of the still. The third patent describes and claims the use of preheated air for combustion in the firebox in conjunction with the recirculation of flue gases.

### Oil Cracking.

Automobiles require gasoline. This demand was not met by fractional distillation of the normal gasoline component of crude petroleum. Cracking is the chemical decomposition of high boiling oils to make gasoline. In 1912 cracking entered the industrial field through the Burton process. In Burton the oil to be cracked was heated under pressure to a temperature high enough to effect the decomposition. The heat was transferred by means of furnace gases to the oil in the vessel where it was confined under pressure. With the carbon deposit under heat and pressure there was a constant hazard of fire. In 1919 the cracking processes were Burton, Coast, and Burton-Clark. Each was a batch process.

Gasoline and the high boiling petroleum oils from which it is produced by cracking are chemical compounds of carbon and hydrogen. The gasoline molecules are smaller than the molecules of high boiling oils. Cracking breaks down the larger molecules into the smaller gasoline molecules. This cracking is accompanied by the deposition of carbon—the bane of the cracking art. In the batch cracking process of 1919 the productive time was very short. Charging the still, bringing it up to operating temperature and pressure, pumping it out, cooling it off, and cleaning all took time.

Prior to 1919 Trumble and Dubbs had each devised a method for prolonging the operation. However, the cracking process is a matter of depth as well as of length. The refiner is interested in getting a maximum of gasoline as well as in prolonging the run. The first Bell patent states the desideratum, "to lengthen the time of the runs between cleaning with a corresponding increase in the distillate produced."

Bell was the first to teach the art how to prolong the operation of the cracking process without sacrifice of capacity. His inventions are effective in surmounting the carbon "barrier" when used in practicing either the batch process or the continuous process. Plaintiff turned at once to continuous cracking with the Bell patents. In the latter part of 1920 a battery of stills was equipped with the Bell inventions. For the first time in history continuous cracking to produce gasoline was practiced commercially. All subsequent commercial cracking has been continuous. The Burton and Burton-Clark stills soon passed out of use. Further improvements followed, each adding its value to the Bell inventions. The runs between shutdowns grew longer and longer and production was maintained at a high rate. By 1925 the established practice of plaintiff was to run 204 hours between shutdowns.

## Bell Inventions.

About 1912 Cudahy Refining Company, predecessor of Sinclair Refining Company, became interested in cracked gasoline. E. W. Isom, a young engineer of that company, was given the task of learning about the cracking process. He investigated the contemporary apparatus and processes and read the literature on the subject. He built a small still, copying Burton, and experimented with it. He witnessed many demonstrations. In 1917 he built a small experimental still for testing vertical heating tubes but encountered "carbon trouble."

In the continuous method of operation additional oil was continuously fed to the still, vapors were continuously taken off from the still, and the liquid residue of the cracking was continuously drawn off from the still. Isom sought to perfect the continuous method. He thought the small size of his still was partly responsible for the "carbon trouble." He recommended to plaintiff's officers that plans be drawn for the installation of a battery of ten stills properly designed and of commercial size for the East Chicago Indiana refinery at an approximate cost of $1,000,000. This recommendation was approved.

For this project Isom determined to secure the best engineering talent. In 1917 he employed John E. Bell, an eminent physicist, thoroughly trained in problems of heat transfer and of handling materials under pressure. Bell directed further experimental work on the small still and witnessed its operations in the fall of 1917 and 1918. He was responsible for the designs of the stills subsequently built by plaintiff. The furnace structure and other features of the large stills designed by Bell were entirely different from the small still.

It was decided to build five stills and experiment with them to obtain the information to be used on succeeding stills. The five stills were part of a battery of ten stills to be designated still battery 10. In August, 1919, the first still designated still 100 was completed and put in operation. The next stills to be completed were stills 99, 98, 97, and 96 in the order named. Still 99 closely followed still 100, and still 98 was placed in operation in October, 1919. However, Isom encountered in the stills put into operation "hot tubes" and "carbon trouble."

These stills of still battery 10 constituted a laboratory in which numerous experiments were carried on. One still was equipped with one type of apparatus, another with another type. Experimentation was carried on until the fall of 1920 when still battery 10 was finally completed. These cracking stills were not under the regular refinery management until 1922. Prior thereto they were classed as an experimental unit and were under the supervision of one Herthel, specially detailed to the work.

Before the stills could be successfully run continuously something had to be done to protect the tubes from overheat. On the second run of still 100 continuous operation was attempted and "hot tubes" made it necessary to discontinue after 17 hours of operation. The third run and the fourth runs were terminated for the same reason after 15¾ hours and 22 hours, respectively. If continuous operation was to be accomplished, something further had to be done to protect the tubes from overheating. Experience had shown that the major "hot tube" trouble occurred with the front row of the bank of vertical cracking tubes, particularly at that portion of those tubes lying in the region of the first pass of the hot products of combustion from the firebox. In their efforts to overcome this difficulty they experimented with the use of a checkerwall in front of the tubes and "an additional baffle wall to protect our tubes."

Finally an expedient for overcoming the "hot tube" difficulty was suggested by Bell. He suggested tempering the products of combustion before they contacted with the heating tubes by returning flue gases that had previously passed over the heating tubes and mixing them with the fresh hot products from the firebox. Bell was not at all certain that his proposed recirculation of flue gases would accomplish the desired results. He made other suggestions for handling this difficulty and he wanted the experimentation with those other suggestions continued. He was not sure that this scheme of recirculation might not result in overheating the other tubes.

In his letter of September 26, 1919, Bell suggested trying out the recirculation of flue gases on still 100. Later it was planned to try it out on still 98. Actually it was first tried on still 97. One means suggested by Bell for effecting this recirculation of flue gases consisted of two steam blowers on each side of the furnace structure. They became known as side blowers. In a letter of November 8, 1919, Bell states that the blowers "seemed to work all right," that the heating gases were cooled, and that he had not been able to determine how much they had been cooled. He stated that due to low steam pressure he could not recycle as large a proportion of the gases as he would like. He stated that Herthel intended to use the blowers regularly on that still when it was put in service during the following week

and that such regular use "is about the only way I can see to determine just what the effect is."

Still 97 was nearly completed, yet no provision had been included in the design of this still for the recirculation of flue gases. Not only was it necessary to await the fabrication of elbows and connections, but brickwork of the furnace structure of the still had to be torn out and rebuilt. Holes had to be cut through steel casings and other things had to be done before the installation could be made. It was November, 1919, before they were ready to start experimental work with these "side-blowers." Early in November, 1919, fire was put under this still for the purpose of drying out the brickwork. It was necessary to have oil in the still whenever it was fired, so the record shows that oil was charged to the still for this drying out operation. Before the still was ready, it had to be tested for leaks. The first six or seven runs of still 97 were for that purpose.

The "side-blowers" were in reality steam siphons and their operation depended upon adequate steam pressure. The East Chicago Refinery of plaintiff was built under war conditions when it was impossible to secure the proper steam boilers. The boilers installed failed to supply the need during the severe winter months. On the very first run of still 97 there appears the entry "low steam." This indicates that the steam pressure in the steam mains leading to the stills was so low that the engines could not be properly handled. The record during November, 1919, shows that the fires had to be "pulled" and the "still pumped out due to low steam." The steam situation was so acute that one of the oil stills (96) had to be turned into a steam boiler to furnish steam for the refinery and was used for that purpose during December, 1919, and January and February, 1920.

During December, 1919, all of the cracking stills were shut down. No run of any description was made. This closing down of the pressure stills interrupted the experimental work being carried out on still 97 to determine the effectiveness of "recirculation of flue gases" as a means of preventing "hot tubes." Up to the end of November, 1919, only "batch operation" had been tried on still 97. In a letter of December 15, 1919, the superintendent of the process still department of the Sinclair Company said: "We considered our pres-

ent installation an experimental unit for development of operation and maintenance methods and were of the opinion that it would be handled as such by Mr. Mc-Callum and the writer, independent of other supervision except on general refinery matters such as coal and steam supply; charging stock supply; handling of products, etc. This would continue until such time as considered advisable to turn over to refinery operation."

The stills remained shut down during the month of January, 1920, except for a few experimental runs on stills 97 and 98. January 18, 1920, a test was made to determine the effectiveness of "recirculation of flue gases," in prolonging continuous operation. This run extended over 36 hours. The data obtained during this run and that obtained during a batch run on still 99, which was not equipped for recirculating flue gases, were reported by Herthel to Isom in a letter dated January 26, 1920. This data shows that the run using "recirculation of flue gases" was of longer duration and at a higher rate of production than the run on still 99. This was an advance, but no reliable conclusion could be drawn from a single run. During February, 1920, a total of eight experimental runs were made on still 97. Five were of the continuous type and involved the use of the "side blowers." The continuous run which started February 6 lasted but 18½ hours; that starting February 16 lasted 31½ hours; that started February 24 lasted 26½ hours. However, run No. 23, starting February 8, lasted for 52 hours, with a production of 41,440 gallons of distillate, and run No. 28, starting February 27, lasted 58½ hours, producing 46,250 gallons of distillate. Not only were these two runs by far the longest runs ever made, but the average production in each case was approximately 800 gallons per hour. These test runs on still 97 were witnessed only by those on the pay roll of the plaintiff. They were confined to plaintiff's refinery. Various other expedients were being tested out on the other stills during this same period for protecting the tubes against overheating. Decision to adopt the Bell inventions as standard practice was made during March, 1920.

On March 9, 1920, Herthel, in charge of the development of these pressure stills, issued orders to the engineer having special charge of construction that means for recirculating flue gases be incorporated in the design of the large stills. These orders were given in a letter of March 9, 1920:

"Results developed using side blowers on still #97 heater for lowering temperature of furnace have proved so satisfactory that we will use similar blowers on all heaters.

"Kindly incorporate this scheme into your designs and order materials for same."

Experiment had demonstrated that recirculating flue gases would protect the tubes from overheating and make continuous operation possible. Side blowers for that purpose were installed on all the other stills of battery 10 at East Chicago in the latter part of 1920. Another battery, designated still battery 11, was built at the East Chicago refinery in 1921. Side blowers were used on all the stills of that battery. A battery of ten stills was constructed at the Coffeyville, Kan., refinery during 1922 and 1923; two batteries of ten stills each were constructed at the Houston, Tex., refinery in 1924; a battery of ten stills was constructed at the Kansas City, Kan., refinery in 1924; still battery 12, consisting of ten stills, was constructed at the East Chicago, Ind., refinery in 1924; still battery 13, consisting of ten stills, was also constructed at the East Chicago refinery in 1925; and two batteries of ten stills each were constructed at the Marcus Hook refinery in 1925. In all, one hundred of these stills have been built by the Sinclair Refining Company and each still was equipped with means for tempering the hot products of combustion from the firebox by admixing therewith recirculated waste flue gases, as described and claimed in the first and second patents in suit. By protecting the tubes from overheating without reducing the capacity of the still, advantage could be taken of many improvements in pressure still operation. These and other developments which followed made it possible to increase the length of the run from 17 hours to 204 hours as regular schedule operation, with a production of 460,000 gallons of distillate per still per month.

Patents in Suit.

The patents in suit afford an exposition of the Bell inventions and the position of those inventions in the art. Patent No. 1,574,546 defines the art: "My invention relates more particularly to pressure stills used for the purpose of cracking hydrocarbons of higher boiling points such

as crude petroleum, gas oil and the like, to form more volatile or lighter hydrocarbons such as those that constitute commercial gasoline. * * *"

It designates the object of the invention: "[It] has specifically for its object to protect the tubes from overheating or burning and to lengthen the time of the runs between cleaning with a corresponding increase in the distillate produced."

It then states the nature of the problem: "Stills for cracking oil are heated by furnaces in which coal, gas or oil is burned and for economy in fuel consumption it is desirable that the fuel be burned in the furnace with the least amount of excess air and the maximum furnace temperature. When there is a fresh charge of oil in the stills free from carbon this can be done without fear of injury to the tubes or other heat absorbing portions of the still. When, however, carbon is formed in the process and is deposited on the inside of the tubes or heating elements of the still as in the case of cracking stills, this condition no longer exists as the coating of carbon or heavy tar is a poor conductor of heat and insulates the metal surface from the oil on the inside with the results that the temperature of the metal increases over the temperature of the oil, the amount of this increase being proportional to the thickness of the carbon deposit and to the amount of heat delivered to the external surface heated from the furnace. It follows that unless stills are frequently shut down for cleaning or the temperature of the furnace itself is reduced it is difficult to maintain the stills in operation for a sufficient length of time to make such operation commercially practical. There is also a hazard to life and property due to the possible bursting of a tube which has become overheated and burnt, as the pressure in the stills is maintained at approximately 100 pounds per square inch and any break or rupture is followed by disastrous fire. The tubes or other heating surfaces most exposed to the heat of the furnace will be the first to suffer * * *."

The specification of the patent then describes the invention: "In my improved form of still the heat absorbing surface is protected from the direct radiation of the furnace by the interposition of a high bridge wall and a vertical flue with refractory walls, in its preferred arrangement, although other forms of passages and screens might be used. To still further protect the still surface of first contact with the furnace gases, I introduce a diluting body of air or gas into the connecting flue, at a point near the furnace. This reduces the gas temperature and also the temperature of the refractory walls. The heat absorbed by the surface first in contact with the furnace gases is thus reduced in two ways; namely, by the lower temperature of the gas and second, by a reduction in the temperature of the refractory secondary radiating surfaces. If the diluting gas is not heated, the obvious result is a reduction in efficiency such as accompanies the burning of fuel with an excessive amount of air. I have found, however, by experiment that if the temperature of the diluting gas is approximately the temperature of the waste gases leaving the still surface that not only is there no reduction in the fuel economy and capacity but on the other hand there is a slight increase in both."

The specification then states two methods of applying the invention and explains each of them: "I may use either one of two methods for supplying the dilutant gas at the proper temperature. In one way of applying this invention a proportion of the waste gas at the temperature at which it leaves the still is drawn aside and returned to the furnace. * * * Referring to the first method it is obvious that when the same amount of fuel is burned in the furnace that a measure of efficiency and capacity of the still can be made from the temperature and weight of the waste gases. The weight of the gases is not, however, changed in my improved heater and experience and theory show that this temperature is reduced. In a still in which oil is mechanically circulated the temperature of the heat absorbing surface differs little from that of the oil which for the purpose of calculation can be considered as uniform."

The second of the patents in suit, No. 1,574,547, was granted on an application filed as a continuation of the application on which the first patent issued and is therefore entitled to the benefit of the date of the application for the first patent in so far as the disclosure of the second is to be found in the first. The disclosures of the two are identical in all respects material to this litigation. The second patent claims the invention as a process, the first as an apparatus.

The third of the patents in suit, No. 1,623,773 combines the preheating of combustion air with the apparatus and process of the first two patents. Like the first two, the third patent can speak for itself. After stating the problem in much the same language as the first two, the third patent continues:

"According to the present invention, I return and admix with the products of combustion in the firebox or between the firebox and the heating chamber of the still, a part of the hot flue gases from near the outlet of the heating chamber. In addition I preheat air by heat interchange with the flue gases escaping from the still and utilize the preheated air for promoting combustion in the firebox. By preheating the air, a more intense combustion is obtained at a correspondingly increased temperature, but by admixing the products of combustion with the returned flue gases the increased temperature of combustion is modified and the products of combustion are cooled before they come in contact with the heating surfaces of the still. The objections incident to excessive temperatures and increased combustion are thus avoided so that advantage can be taken of the increased heating effect of such temperatures and combustion. By regulating the amount of the flue gases returned and admixed with the products of combustion, the temperature of the heating gases can be reduced from the highest temperatures of the firebox to a predetermined lower temperature before the gases come in contact with the heating surfaces of the still. The flue gases which are returned are at approximately the temperature of the waste gases leaving the heating chamber, and, while these gases serve to reduce the high temperatures obtained with the preheated air in the firebox, they reduce it only a part of the way down to the temperature of the returned gases. Accordingly, the dilution of the products of combustion is not accompanied by a reduction in efficiency such as accompanies the burning of fuel with an excessive amount of cold air, or such as would accompany the introduction of cold gases. On the contrary, the reduction in efficiency commonly incident to the use of cold air in the firebox is avoided by the use of preheated air, and the efficiency of the heating operation thereby improved; while the operation is further improved and danger of overheating avoided or minimized, and a more uniform heating effect obtained, by the return of the flue gases for admixture with the products of combustion.

"In my prior application Ser. No. 532,482, filed January 28, 1922, and my companion application, Ser. No. 656,672 filed August 10, 1923, I have described and claimed the improved method and apparatus in which a part of the flue gases are returned for admixture with the products of combustion to lower the temperature of the products of combustion before they come in contact with the heated surfaces of the still. The present invention includes the improvement of said prior applications and further improves the operation of the stills by increasing their efficiency and capacity. In addition to returning a part of the flue gases, the present invention provides for utilizing the flue gases after they have served their purpose in heating the still, by preheating air therewith and supplying the preheated air for promoting the combustion and improving the heating operation. This improved heating operation which would otherwise be objectionable because of the increased temperatures is thus taken advantage of and its objections overcome. The increased intensity of combustion and the increased temperatures obtained by the use of the preheated air enable an economy in fuel consumption to be obtained with like heating effect, or, with the same fuel consumption, cause an increased heating effect; while the moderating of the high temperatures by the admixed hot flue gas gives a more uniform heating effect, decreases the temperature of the gases first coming in contact with the still, increases the velocity of the gases passing over the heating surfaces, and gives an increased heating effect at parts of the still more remote from the firebox."

In the operation of the apparatus illustrating the first two patents in suit a charge of oil is circulated by means of a pump from the drum upwardly through the heating tubes and back to the drum. The heating tubes are arranged in the heating chamber, and in these tubes the circulating oil is heated to the cracking temperature. The oil is maintained under pressure in the drum and in the tubes. The liberated vapors pass off through the vapor line. Fuel is burned in the firebox. The hot products of combustion flow from the firebox through the passageway to the upper end of the heating chamber, and then downwardly through the chamber and over

688

the heating tubes arranged therein. As these furnace gases leave the heating chamber, part of them pass to the stack and part of them are returned by means of a steam jet blower. This returned part of the furnace gases flows upwardly through the passageway in which the gases mix with the hot products of combustion from the firebox. Thus the heating gases flowing over the tubes in the heating chamber are a mixture of hotter products of combustion from the firebox and cooler flue gases which have previously passed through the heating chamber. Heat radiated from the firebox is also absorbed by the gas mixture flowing through the passageway, and heat so absorbed is transferred to the tubes by the gas mixture instead of by direct radiation. This tempering is the Bell step across the "carbon" barrier.

In the operation of the apparatus illustrating the third patent in suit, instead of using cold air for combustion, the air for combustion is preheated by heat exchange with that part of the furnace gases passing to the stack from the heating chamber. The other part of the furnace gases leaving the heating chamber is returned to the lower end of the passageway. The preheated air for combustion is delivered to the firebox. This preheating of the combustion air conserves heat which otherwise would be lost in stack gases, but it also increases the temperature of combustion.

### Claims in Suit.

The distinguishing and essential characteristics of the claims in suit as a group are: (1) All of the claims in suit are specifically directed to an oil cracking apparatus or an oil cracking process. (2) All of the claims in suit are specifically directed to an oil cracking apparatus, or process, in which recirculated flue gases are used as a tempering diluent. (3) All of the claims in suit which refer to the use of preheated air, refer to it only for combustion. (4) All of the claims in suit which refer to the use of preheated air refer to it only for combustion in conjunction with the use of recirculated flue gases as a tempering diluent.

Claim 3 may be taken as typical of the claims in suit of patent No. 1,574,546: "3. A tubular oil cracking still having a heating chamber, an inlet and an outlet to the heating chamber, a firebox communicating with said chamber at the inlet thereof, a flue communicating with said chamber near the outlet thereof, a series of oil heating tubes adapted to be externally heated extending through said heating chamber, a flue connecting the said heating chamber near its outlet with the fire box, and means for forcing the return of a portion of the products of combustion from the heating chamber through said flue to the fire box, whereby the heating gases from the fire box are tempered by the returned hot gases of lower temperature and the resulting mixture is passed through the heating chamber."

Claims 1 and 2 may be taken as typical of the claims in suit of patent No. 1,574,547:

"1. The improvement in the heating of oil cracking stills in which oil is heated to the cracking temperature by hot products of combustion from a furnace passing externally over the oil heating surfaces of the still, which comprises recycling over the oil heating surfaces in admixture with fresh products of combustion from the furnace a portion of the hot waste heating gases which have previously passed over the heating surfaces.

"2. The improvement in the heating of oil cracking stills in which oil is heated to the cracking temperature by heat transferred to the oil through heating surfaces from hot products of combustion passing over the oil heating surfaces from a furnace in which fuel is burned, which comprises diluting the hot products of combustion from the furnace with hot waste heating gases which have passed over the heating surfaces and passing the resulting admixed heating gases over the oil heating surfaces."

Claim 7 may be taken as typical of the claims in suit of patent No. 1,623,773: "7. The improvement in the heating of oil cracking stills in which oil is heated to the cracking temperature by hot products of combustion from a firebox passing externally over the oil heating surfaces of the still, which comprises increasing the temperature of the products of combustion from the firebox by supplying preheated air to the firebox, then decreasing the temperature of the products of combustion from the firebox by admixing recirculated waste heating gases therewith, passing the resulting gaseous mixture over the oil heating surfaces, and preheating the air supplied to the firebox by heat interchanged with the hot waste heating gases

escaping from the still, the recirculated hot waste heating gases being returned immediately after passing over the oil heating surfaces and being at approximately the temperature of the heating gases employed in heat-exchange with the air for preheating it."

### Infringement.

There is no real issue of infringement in this case. This is immediately apparent on comparison of defendant's diagram, Exhibit A, attached to the amended answer, with the apparatus and process disclosed in the patents in suit and claimed in the claims in suit. The apparatus in Exhibit A and in plaintiff's Exhibits 35 and 41 is a Jenkins cracking still. Plaintiff's Exhibit 41 shows the apparatus and process of defendant. The claims in suit read directly on this apparatus and process of defendant. Element by element and step by step the terms of the claims in suit apply to the apparatus and process of defendant with precisely the same meaning they have in defining the elements and steps of the patents in suit. The advantages of the patented apparatus and process are realized in the defendant's apparatus and process. In defendant's practice, flue gases which have passed over the oil heating tubes of its Jenkins cracking still are recirculated, admixed with hot products of combustion from the firebox, and repassed over the oil heating surfaces. The recirculated flue gases temper and dilute the hot products of combustion from the firebox, precisely as in the patents in suit. In defendant's practice, preheated air is used for combustion in the firebox in conjunction with the return of flue gases as a tempering diluent, precisely as in the third patent in suit.

Defendant's apparatus does not include the high vertical bridgewall of the patents in suit. Instead, it includes an elongated horizontal passageway between the firebox and the heating chamber in which the heating tubes are arranged with provision for flowing the recirculated flue gases as a blanket through the upper part of this passageway over the hot products of combustion from the firebox. The defendant's arrangement operates to minimize direct radiation from the firebox to the heating tubes. This is the stated purpose of the bridgewall of the patents in suit and this bridgewall arrangement is within the equivalents for this bridgewall contemplated in the patents in suit.

The claims of the patents in suit are perfectly plain and mean what they say. They are fulfilled in all respects by defendant's process and apparatus. Defendant proposes that the court read into the claims a limitation which does not appear in them, namely, "complete screening of the oil tubes from direct radiation," because, as it contends, the specific structures described in the patents in suit include a bridgewall between the combustion zone and the heating tubes, and because the preferred embodiment of the invention includes such a screen. Defendant's argument appears to be based on two false contentions: First, that in defendant's practice the oil-heating tubes are not effectively protected from harmful radiation from the firebox; and, second, that absolute and complete screening of the tubes in a chamber definitely separated from the firebox by a bridgewall is essential to the inventions of the Bell patents. In defendant's structure the tubes are protected from harmful direct radiation by means fully equivalent to those disclosed and contemplated by the patents in suit. It is appropriate that in the specifications of the Bell patents the particular structure which had proved so successful be specifically described and illustrated. The patent specifications, however, do not limit the invention to the structure specifically illustrated.

Defendant's recirculation of flue gases as shown in plaintiff's Exhibit 41 parallels precisely the description and illustration of the Bell inventions in the patents in suit and the embodiment of those inventions in plaintiff's refinery practice, and plaintiff has urged no interpretation of the claims in suit which is not fulfilled to the letter by defendant's process and apparatus.

### Validity.

#### Public Use of Bell Inventions.

The effective application date of the first and second patents is January 28, 1922. It is pleaded in the amended answer that these two patents should be held invalid by reason of public use more than two years prior to the application date.

The testimony is all to the effect that such use of the Bell inventions as occurred prior to January 28, 1920, was experimental. The use was experimental at least up to the fall of 1920, when the second group of five stills of battery No. 10 was completed and put in operation. The use of the Bell inventions prior to January

690

28, 1920, was experimental. That use consisted of certain tests in November, 1919, and certain other tests in January, 1920, as narrated in detail in the earlier part of this opinion.

There has been no suggestion by the defendant that the apparatus was sold nor that it ever passed out of the possession of the plaintiff or from under the supervision of Bell during the pertinent period. There was a single installation of the device of the patents in suit and that within the confines of the plaintiff's refinery at East Chicago, Ind. There is no evidence that the apparatus of the patents in suit was over displayed to or operated in the presence of any one other than those on the pay roll of the plaintiff company.

Generally speaking, the defendant must establish its defenses, so from that point of view the burden of proof is on defendant. In the case at bar, there would seem to be no occasion to depart from the rule that the defendant must establish the defenses on which it relies. This defendant has not been handicapped by plaintiff's possession of the relevant documents and employment of the informed individuals. These individuals were subpoenaed and subjected to examination by defendant and plaintiff's documents in great number were produced by plaintiff.

The evidence, both oral and documentary, is all to the effect that the use of the Bell inventions was experimental until March, 1920, and perhaps until the fall of 1920.

### Prior Art.

The prior art practices represented by certain patents and prior uses cited by defendant (set forth in the footnote)[1] are so far removed from the cracking of petroleum oil to produce gasoline as to make them irrelevant on the issue of validity of the Bell patents here in suit. These patents do not deal with high pressures; high temperatures; chemical reaction; transfer of heat to liquids through metal surfaces; deposition of any solid whose steadily increasing thickness progressively decreases the heat transfer. They do not involve any danger element and present no condition of desirable prolongation of a run together with an obstacle to such prolongation. They afford no assistance to individuals expending every effort to effect improvements in the cracking of petroleum oil to produce gasoline by processes and apparatus which would be safer and more economical than the Burton and Burton-Clark stills.

The Coast patent No. 1,355,312 does not disclose any recirculation of flue gases for any purpose. There is no tempering of any hot products of combustion from a firebox. Neither a procedure for tempering nor a purpose to temper heating gases appears anywhere in the Coast patent. Coast's proposal does not touch on the matters here under consideration. He proposed two stills, a pipe still and a shell still, each with its own provision for heating the oil therein. Nothing of that sort is proposed in the Bell patents and nothing of that sort has been used by defendant. The Coast patent is a "paper patent" and does not anticipate Bell.

The Dubbs patent, No. 1,783,185, describes a common expedient which has no relation to diluting hot gases of combustion for the purpose of reducing the temperature of the gases rising from the combustion at a particular point of application and increasing the volume and velocity of those gases at another point for the attainment of a desirable end. Dubbs patent is concerned only with supplying to a burner through which fuel is fed air appropriate for the combustion of that fuel. The suggestion is that this air be admitted in part directly with the fuel and as to the remainder at a point under the burner. This division of the total air supplied into two parts admitted at two different places reduces the danger of back-fire in the burner. That is the Dubbs disclosure in so far as it relates to the admission of preheated air.

The Alexander patent, No. 1,387,677, was granted August 16, 1921, subsequent to the Bell invention. It is a mere paper patent. All that defendant asserts to be pertinent in the specification is to be found in two sentences: "The flame temperatures may be made more uniform by the use of various chemical expedients such as * * * (return of waste gases). * * * The use of flames tempered by introduction of products of combustion in a well known manner is desirable but not necessary in the present invention."

[1] Moller German patent No. 89,024; Doherty U. S. patent No. 1,222,741; Rusby and Taussig No. 1,110,991; Geyer No. 425,170; Habig No. 1,278,639; Kitchen No. 1,008,273; American Steel Foundries prior use in Core Drying; and Brown, Lipe & Chapin prior use in heat treating metal parts.

Such vague suggestions of what might be done cannot defeat a meritorious invention recognized and adopted by the practical art. It is the hot products of combustion from the firebox which are tempered in the practice of the Bell inventions. Alexander's suggestion is that the flames be tempered by the use of "chemical expedients." There is a wide gap between physical and chemical phenomena.

As Judge Woolley said in the Trumble Case: "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L.T.(N.S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R.P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: "That gives me what I wish?"' The Pope Alliance Corporation v. The Spanish River Pulp & Paper Mills, Ltd. (Privy Council Appeals No. 33 of 1928)." Skelly Oil Co. v. Universal Oil Products Co. (C.C.A.) 31 F.(2d) 427, 431.

The court finds the claims in suit are valid and infringed. The plaintiff is entitled to the injunction and relief prayed for.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½ (28 U.S.C.A. following section 723).